STATE OF CONNECTICUT *v.* MICHAEL DAVIS
(11809)

STATE OF CONNECTICUT *v.* SHERMAN ADAMS
(11782)

HEALEY, SHEA, DANNEHY, SANTANIELLO and CORRIGAN, Js.

Argued December 6, 1985—decision released March 11, 1986

*Jon C. Blue,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant in the first case).

*Sue L. Wise,* special public defender, for the appellant (defendant in the second case).

*Frank S. Maco,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Frederick W. Fawcett,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendants, Michael Davis and Sherman Adams, were each found guilty, after a joint trial[1] to a jury, of the crimes of burglary in the second degree, in violation of General Statutes § 53a-102 (a), and larceny in the third degree, in violation of General Statutes (Rev. to 1981) § 53a-124 (a) (1). These appeals followed.[2]

Both appeals arise out of a burglary and larceny in an apartment building in Stratford on December 17, 1981, during which both defendants were apprehended at the scene by Stratford police officers who were dispatched to the building between 8 and 8:30 p.m. on a "peeping Tom" call. The state adduced evidence that when the officers arrived, they observed two sets of footprints in the snow leading from the parking lot to an apartment window in the back of the building on the ground floor. They also observed the intermittent use of a flashlight and heard voices inside the darkened apartment. While one officer remained at the open window, a second officer entered the building into a common corridor and observed the defendant Davis come out of the apartment involved. He was carrying a white pillowcase which was found to contain personal property of the tenant of that apartment who was away on vacation in Colorado. As the defendant Adams jumped from the window of the burglarized apartment, he was apprehended by the officer who had remained at that location.

After the state rested its case, the following colloquy which generated these appeals took place:

"The Court: Are you ready to proceed, gentlemen?

[1] At trial, the defendant Sherman Adams was represented by the office of the public defender for the judicial district of Fairfield, and the defendant Michael Davis was represented by Alan Bleiman, a special public defender.

[2] This court denied the state's request to combine the appeals but did permit the state to file a single brief addressing the briefs filed by each defendant. The two appeals were argued together in this court.

"Mr. Bleiman: Yes, Your Honor. If we may, before the jury comes in, I'd like to make a statement for the record. My client, Michael Davis, has asked me to call one witness, who in my judgment, I do not think it would be wise to call, and under those circumstances, I have declined to follow Mr. Davis' instructions, in that regard. I'd like the court to be aware of that and I'm stating that now to protect any rights that any parties, between my client and myself, might have with respect to this. And I'd ask the court to give Mr. Davis the opportunity to make a statement in this regard if he sees fit.

"The Court: Well, I have to assume that the decision not to call this particular witness is a tactical decision that experienced trial counsel has made. He's the one who's lived with the case. He's been in attendance throughout and I respect his judgment. I have no basis or reason to make an independent judgment.

"Mr. Bleiman: Yes, Your Honor. Thank you.

"The Court: All right.

"Mr. Schipul: Your Honor, just for the record, my client has also requested a witness be called who in my judgment need not be called. Should not be called for purposes of this trial.

"The Court: I would simply reiterate my earlier comment with respect to tactical judgment made on the part of trial counsel. Are we ready to proceed, gentlemen?"

The defendant Adams did not testify but offered evidence through a witness, Almad Sanders, that he and Sanders had been drinking from about 7 p.m. at Sanders' home and that the two parted company after 8 p.m. Sanders testified that Adams was depressed and very intoxicated. The defendant Davis took the stand as the only witness in his behalf. He maintained that

on the night in question he and a friend named Ricky were drinking beer, smoking marihuana and talking about women. As a result of their conversation, he said that they went to the apartment building where the break occurred to see a woman Ricky knew. The latter pushed a house button for an apartment and was buzzed in. Davis, acting, he said, on Ricky's instructions, went to a second floor apartment while Ricky went back to his car. Davis maintained that he told a woman who answered that he had been sent up by Ricky who wanted to know if he could come up and visit. As a result of her answer, Davis returned to the first floor lobby expecting to find Ricky, who was not there and whose car was gone. He waited in the lobby for about five to ten minutes and panicked and ran when he saw one of the officers, who had been dispatched there, approaching with his gun drawn. He was apprehended and a later search of him at the scene disclosed a flashlight and a screwdriver on his person.

Both defendants have framed the issue on these appeals as follows: "In a criminal case in which counsel had been appointed to represent the defendant, did the refusal of counsel to call a witness that his client had instructed him to call and the court's explicit approval of that refusal, where there was no allegation that the requested testimony would be either perjurious or irrelevant, violate the rights of the defendant to be heard and to have compulsory process to obtain witnesses in his behalf guaranteed by Conn. Const. art. I, Sec. 8?"

Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . [and] to have compulsory process to obtain witnesses in his behalf . . . ."

Both defendants make identical claims.[3] They claim that the Connecticut constitution grants "a right to be heard" directly to the defendant and that the dispositive issue is not whether the decision of the trial court and their counsel deprived them of the effective assistance of counsel but whether those decisions denied each his "right to be heard by himself." They maintain that this decision was one ultimately for the defendant to make because "the Connecticut constitution clearly allocates [it] to the accused." Each defendant argues that the trial court "explicitly acquiesced" in counsels' decisions, characterizing them as "tactical," and did not give either of them "a requested opportunity to make a statement for the record." Contending that the question is not one of the dignity or authority of counsel but, rather, is one of the ultimate allocation of constitutional power, they claim that the independent right of a defendant under article first, § 8, "to be heard by himself" encompasses "the right to call witnesses on one's behalf." A defendant has this right, they maintain, "by himself" as well as "by counsel." They assert that if the exercise of this right is solely within the discretion of counsel, then we would be obligated to hold the language "by himself" to be mere surplusage. They further argue that this right does not rest on policy nor does it intrude on courtroom decorum. Moreover, they say that it does not rest on terminology alone, but also draws support from the historical context in which the Connecticut constitution of 1818 was adopted. This, they suggest, serves to reinforce their claim that the organic language of our constitution requires that we declare that a criminal defendant has the ultimate decision-making right under article first, § 8. We must reject the defendants' claims.

In arguing that this decision-making right ultimately rests in defendants alone, they also claim that to deny

---

[3] The briefs filed by the defendants are similar and so we do not distinguish between them unless noted.

them that right also denies them their right to compulsory process as articulated in article first, § 8, because that right is given to "the accused." In making this claim, the defendants recognize that the Supreme Court of the United States has said that an accused who claims a violation of his constitutional right to compulsory process "must at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense." *United States* v. *Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). Each defendant argues that he was precluded by the trial court from making such a showing. The defendant Adams argues that although Davis' attorney asked the trial court to "give Mr. Davis the opportunity to make a statement in this regard if he sees fit," the trial court ignored his request saying that it would defer to counsel's "tactical decision" rather than "make an independent judgment." The defendant Adams argues that while his counsel joined in that request, he did not make any offer of proof in light of the trial court's position.

On the other hand, the state counters that article first, § 8, of the Connecticut constitution does not guarantee a criminal defendant, represented by counsel, the right to make the ultimate decision as to what witnesses shall be called during the trial, but rather maintains that that decision is a tactical one for counsel. Arguing that the defendants' claims here have no historical support, the state contends that the claimed right simply cannot be equated with certain other rights, the exercise or nonexercise of which clearly belongs to a criminal defendant alone. Here the state refers to such rights as the decision to be tried by a court or a jury, to plead guilty or to take the witness stand, and to testify in one's own behalf. Because the decision is a tactical or strategic one, the state suggests that a claim that a defendant's counsel refused to call witnesses he

requested is essentially a claim going to the competency of counsel which is better resolved in another proceeding.

At the outset, we note that the defendants have not asserted that the right of an accused to make the ultimate decision in the calling of a witness is a federal constitutional right. They do not point to, nor does our research disclose that the United States Supreme Court has determined that there is such a federal constitutional right. We note this, bearing in mind that " 'although we fully recognize the primary independent vitality of the provisions of our own constitution'; *Horton* v. *Meskill,* 172 Conn. 615, 641, 376 A.2d 359 (1977); 'the decisions of the United States Supreme Court defining federal constitutional rights are, at the least, persuasive authority'; id.; and thus may be 'afforded respectful consideration.' Id., 642; see also *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 66, 469 A.2d 1201 (1984)." *State* v. *Gethers,* 197 Conn. 369, 385, 497 A.2d 408 (1985). "In the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." *Horton* v. *Meskill,* supra, 642–43. In this context, the United States Supreme Court has not squarely addressed the issue of whether the federal constitution

guarantees to a criminal defendant the right to make the ultimate decision on whether to call a witness. Chief Justice Burger has said: "It is also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal; see *Wainwright* v. *Sykes,* 433 U.S. 72, 93 n.1, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (Burger, C.J., concurring); ABA Standards for Criminal Justice 4-5.2, 21–22 (2d ed. 1980)." *Jones* v. *Barnes,* 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983). In *Wainwright,* the Chief Justice said: "Once counsel is *appointed,*[4] the day-to-day conduct of the defense rests with the attorney. He, not the client, has the immediate—and *ultimate*—responsibility of deciding if and when to object, *which witnesses, if any to call,* and what defenses to develop. Not only do these decisions rest with the attorney, but such decisions must, as a practical matter, be made without consulting the client." (Emphasis added.) *Wainwright* v. *Sykes,* supra.

It has been generally recognized that decisions concerning matters of trial strategy and tactics rest with the lawyer, as opposed to decisions concerning such inherently personal rights of fundamental importance to the defendant as those referred to in *Jones* and in *Wainwright.* See, e.g., *Henry* v. *Mississippi,* 379 U.S. 443, 451–52, 85 S. Ct. 564, 13 L. Ed. 2d 408, reh. denied, 380 U.S. 926, 85 S. Ct. 878, 13 L. Ed. 2d 813 (1965); *Nelson* v. *California,* 346 F.2d 73, 80–81 (9th Cir.), cert. denied, 382 U.S. 964, 86 S. Ct. 452, 15 L. Ed. 2d 367 (1965); *Townsend* v. *Superior Court,* 15 Cal. 3d 774, 781, 543 P.2d 619, 126 Cal. Rptr. 251 (1975);

---

[4] We note that in *Wainwright* counsel whose conduct was challenged by the defendant in that case was also appointed counsel, as in the cases before us. *Wainwright* v. *Sykes,* 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977).

*McClendon* v. *People,* 174 Colo. 7, 14, 481 P.2d 715 (1971).[5] The decision as to what witnesses to call is commonly regarded as a tactical, strategic decision.[6] See, e.g., *Vess* v. *Peyton,* 352 F.2d 325 (4th Cir. 1965), cert. denied, 383 U.S. 953, 86 S. Ct. 1215, 16 L. Ed. 2d 214 (1966); *State* v. *Lee,* 142 Ariz. 210, 689 P.2d 153 (1984); *People* v. *Williams,* 2 Cal. 3d 894, 471 P.2d 1008, 88 Cal. Rptr. 208 (1970), cert. denied, 401 U.S. 919, 91 S. Ct. 903, 27 L. Ed. 2d 821 (1971); *State* v. *Pratts,* 145 N.J. Super. 79, 366 A.2d 1327 (1975), aff'd, 71 N.J. 399, 365 A.2d 928 (1976); see ABA Standards for Criminal Justice, The Defense Function (1982) § 4-5.2 (b) and commentary thereon. We have not, as we were in *Gethers,* been referred to, nor have we found any interpretation by other states of similar language in their constitutions on the issue presented here.[7]

---

[5] In *McClendon* v. *People,* 174 Colo. 7, 14, 481 P.2d 715 (1971), the court said: "It is only when the question arises whether the defendant should plead guilty, waive a jury trial, or take the stand that defense counsel must be governed by and abide by the wishes of his client. [ABA Standards, The Prosecution Function and The Defense Function, § 5.2, pp. 237–238.]"

[6] The Eleventh Circuit has recently said: "This Court will not second-guess tactical decisions of counsel in deciding whether to call certain witnesses." *United States* v. *Long,* 674 F.2d 848, 855 (11th Cir. 1982).

[7] Defense counsel argue that *People* v. *Frierson,* 39 Cal. 3d 803, 705 P.2d 396, 218 Cal. Rptr. 73 (1985), a death penalty case, supports their claim in this case. We do not agree. Initially, *Frierson* is inapposite on its facts. In that case, the defendant asked his appointed counsel to present evidence of his diminished capacity as a defense at the guilt/special circumstance phase of his trial, but counsel refused, apparently believing that it was wiser to withhold such evidence until the penalty phase. Defense counsel did, however, present lay and expert witnesses on that subject at the penalty phase. The *Frierson* trial court, when this conflict between the defendant and his counsel was brought to its attention, ruled that the decision to do so was for counsel to make and not for the defendant. On appeal, the California Supreme Court found that "under the facts of this case," the defendant's claim that the trial court erred in finding that his counsel had the authority to refuse, "over the defendant's express objection, to present any defense to the charged special circumstances," was well founded. *People* v. *Frierson,* supra, 396–97. It is noted that that court, in so ruling, stated that "[t]he principal issue presented is whether a defense counsel's traditional power to control the conduct of a case includes the authority to withhold the presen-

Our recent case of *State* v. *Gethers,* supra, serves as a constitutional footing from which to initiate our analysis. In *Gethers,* the defendant claimed that he was guaranteed the right to hybrid representation by article first, § 8, of the Connecticut constitution which provides that "[i]n all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel. . . ." *State* v. *Gethers,* supra, 382. In making that claim, the defendant in *Gethers* argued, inter alia, that "the standard tools of constitutional construction" required that the plain language of article first, § 8, including the framers' intent demonstrated by the conjunctive "and" in the language "by himself *and* counsel" (emphasis added), be interpreted to guarantee him the right of hybrid representation. *State* v. *Gethers,*

---

tation of any defense at the guilt/special circumstance stage of a capital case, in the face of a defendant's openly expressed desire to present a defense at that stage and despite the existence of some credible evidence to support the defense." *People* v. *Frierson,* supra, 401. A close reading of *Frierson* discloses that the defendant did not make his claim, nor did the court so decide the case, under the California constitution nor, for that matter, under any cognizable part of the United States constitution. Again, it was careful to indicate its narrow holding when it said that there were several considerations in this capital case that led them to conclude "that *this case* is qualitatively different from the bulk of decisions which have properly confirmed counsel's broad control over 'trial tactics,' and is instead *analagous* to those cases which have recognized the need to respect the defendant's personal choice on the most 'fundamental' decisions in a criminal case." (Emphasis added.) *People* v. *Frierson,* supra, 402–403. Again, without any reference to the United States or California constitutions, the *Frierson* court said that both the trial court and defense counsel "misjudged" the scope of counsel's authority to override the defendant's wishes "on a matter of fundamental importance." *People* v. *Frierson,* supra, 405. In the long and thoughtful opinion in *Frierson,* no state constitutional predicate for that decision is stated. Once more, a parsing of the narrowness of its holding emerges when the court says: "We emphasize that our holding rests on the fact that the record in this case *expressly* reflects a conflict between defendant and counsel over whether a defense was to be presented at the guilt/special circumstance stage." (Emphasis in original.) *People* v. *Frierson,* supra, 405 n.8. In addition, that opinion demonstrates that the majority clearly determined that defense counsel's decision at the trial "virtually assured" that the defendant would be convicted of first degree murder with a "special circumstance"—a capital crime. *People* v. *Frierson,* supra, 403.

supra, 382, 385–86. We disagreed and held that article first, § 8, of the Connecticut constitution did not guarantee an accused the right to hybrid representation. *State* v. *Gethers,* supra, 382.

Here again, as in *Gethers,* we recognize that "[i]n dealing with constitutional provisions we must assume that infinite care was employed to couch in scrupulously fitting language a proposal aimed at establishing or changing the organic law of the state. *Cahill* v. *Leopold,* 141 Conn. 1, 19, 103 A.2d 818 [1954]; 1 Cooley, Constitutional Limitations (8th Ed.) p. 125." *State* v. *Gethers,* supra, 386, quoting *Stolberg* v. *Caldwell,* 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson,* 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981). In that connection, the defendants' dispositive claim is that the language in article first, § 8, "the right to be heard by himself . . ." guarantees them the right to make the ultimate decision on whether to call a witness. Otherwise, they argue, the words "by himself" are surplusage and, therefore, such a construction is wholly impermissible. We do not agree. Moreover, this argument regards the alleged right as guaranteed without looking to the remaining words in that very clause, "*and* by counsel." (Emphasis added.) This is required because "[u]nless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution." *Stolberg* v. *Caldwell,* supra, 597–98. We see no such reason. Thus viewed, the defendants' claim here does not have that "superficial appeal" we noted in *Gethers* where we refused to interpret "and" as conjunctive so as to recognize a right of hybrid representation under article first, § 8. Nor, as in *Gethers,* is the defendants' "plain language" argument persuasive.

We, of course, do not, in this "ultimate right to call a witness" case, have all the same considerations which

we did in *Gethers,* although *Gethers* is instructive. We now turn to the defendants' argument, drawing on Swift's System, that given the colonial tradition of self-representation and the then-prevailing distrust of lawyers,[8] it was "unlikely" that the framers of the 1818 constitution intended "forcibly" to take the "ultimate power" to select witnesses from the accused and give it to his counsel, "particularly to appointed counsel." This "unlikely" posit is offered by the defendants without any authoritative nexus to their present claim. In fact, the enhanced status of lawyers in Connecticut was such that at the time the bill of rights was adopted, although there was no Connecticut statute providing it, it was the custom of the courts to assign counsel in all criminal cases. See *State* v. *Gethers,* supra, 389–90; 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 392; see *Faretta* v. *California,* 422 U.S. 806, 827 n.35, 830 n.40, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

In his authoritative historical work, A History of the American Bar (1911) p. 18, Charles Warren said: "So that when the War of the [American] Revolution broke out, the lawyer, from being an object of contempt to restrain whom restrictive legislation was yearly necessary during the Seventeenth Century, had become the leading man in every town in the country, taking rank with the parish clergyman and the family doctor." Thus, by 1818, the status of lawyers in this state had been sufficiently raised so as to enhance their standing in the community and is evidenced in part by the then-prevailing custom of assigning counsel to defendants in criminal cases. This strongly suggests, albeit without concrete declaration, that the advice and services of counsel were regarded as crucial to a criminal

---

[8] In Connecticut, the bar increased "very greatly" after the American Revolution so that in 1798 there were about 120 lawyers practicing in this state. C. Warren, A History of the American Bar (1911) p. 323.

defendant at that time, especially given the inability of a defendant to testify in Connecticut in 1818. An indication of this is that, as Swift notes, not only was counsel for the state permitted to make a statement of the facts intended to be proved to support the prosecution, but counsel for the prisoner could speak to that "by way of defence against [the prosecution]." 2 Swift's Digest (1823) pp. 404–405. The defendants have pointed to no substantive or historical authority that shows that the framers of the 1818 constitution intended "forcibly" to take this "ultimate" power from the accused and give it to counsel. We do not, therefore, interpret article first, § 8, of the Connecticut constitution to grant a criminal defendant the right to make the ultimate decision as to which witnesses to call.

In our determination that the claimed state constitutional right does not exist, we have not overlooked the defendants' related claim that such a right exists "in a criminal case in which counsel had been *appointed* to represent [them]. . . ." (Emphasis added.) Although their briefs do not disclose any principle of law or authority in support of their claim, it merits some general comment. We agree with the United States Supreme Court that "[w]e may assume with confidence that most counsel, whether retained or appointed, will protect the rights of an accused." *Cuyler* v. *Sullivan*, 446 U.S. 335, 344, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). In *State* v. *Mason*, 186 Conn. 574, 577, 442 A.2d 1335 (1982), where the defendant claimed the denial of his federal and state constitutional rights to the effective assistance of counsel, we said that this right to the effective assistance of counsel was "equally applicable, whether defense counsel is court-appointed, or . . . privately retained . . . ." We decline, therefore, the defendants' invitation here to formulate any standard that distinguishes appointed counsel from retained

counsel in the context of the defendants' claims in this case. See generally *United States ex rel. Hart* v. *Davenport,* 478 F.2d 203, 211 (3d Cir. 1973).

The defendants' claim that article first, § 8, grants them a right "to have compulsory process to obtain witnesses in [their] behalf . . ." deserves little discussion. If a criminal defendant does not have the ultimate decision to call witnesses, when represented by counsel, then he is not being denied a purely personal right to have compulsory process to obtain witnesses under article first, § 8. This conclusion accords with the manner in which the defendants frame this issue: "The question is in whom this right [to compulsory process] ultimately reposes: the accused or his counsel." Because the defendants' right to compulsory process is protected here, through representation by counsel, there is no derogation of a state constitutional right. The issue is similar to that addressed in *Gethers,* where we held that the defendant was not denied his state constitutional right to compulsory process because article first, § 8, did not create the right of hybrid representation. We are in agreement, however, with the defendants that our state constitutional compulsory process guarantee is, as they argue, at least as broad as a defendant's sixth amendment right to compulsory process under the federal constitution. See *Washington* v. *Texas,* 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

In light of what we have concluded above, it is unnecessary for us to discuss that branch of the defendants' claim that is based on the "plausible showing" standard of *United States* v. *Valenzuela-Bernal,* supra.

There is no error.

In this opinion the other judges concurred.